**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


MARK HARSH,                          )
        Plaintiff,                )          **Civil Action No. 10-223 Erie**
                                   )
        v.                         )          **District Judge McLaughlin**
                                   )
MICHAEL BARONE, et al,               )          **Magistrate Judge Baxter**
        Defendants.               )


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**


**I.      RECOMMENDATION**

      It is respectfully recommended that the motion for summary judgment filed by

Defendants Maxa and Sherbine [ECF No. 58] be GRANTED.

      The motion for summary judgment filed by Defendants Bunting, Riskus, and Setnik

[ECF No. 67] should be GRANTED.


**II.     REPORT**

     **A.  Relevant Procedural History**

      Because Plaintiff is a *pro se* litigant, and as such is entitled to the protections afforded by

<u>Haines v. Kerner</u> (404 U.S. 519 (1972)) and its progeny, this Court has reviewed the Original

and the Amended Complaints together for purposes of this motion.

      Plaintiff, a former state inmate, alleges that Defendants violated his constitutional rights

in the delayed treatment and care of his broken arm. Plaintiff explains that as a result of an

altercation with a fellow inmate on October 11, 2008, his arm was broken. Plaintiff claims that

an x-ray was not taken until October 14th, and he was not given any pain medications until October 27th. The morning following the altercation, Plaintiff was seen in the Medical Department by an unnamed nurse who could not determine whether his arm was broken. Plaintiff was given a bag of ice which security personnel made him empty into his cell sink. On October 14th, Plaintiff was examined by Dr. Maxa who wrapped the arm in a temporary cast. On October 20th, Plaintiff was examined by an outside orthopedic specialist, Dr. Bleday, who determined that the arm was broken. On October 27th, Plaintiff received pain medication (Tylenol) for the first time. On October 30th, Plaintiff underwent surgery to repair the broken arm. According to Plaintiff, the repair required eleven screws and a steel plate. In follow-up to the surgery, Plaintiff was seen by Dr. Maxa on October 30th and 31st, and November 7th, and seen by Dr. Bleday at his office on November 14th.

Further, Plaintiff alleges that following his surgery prison staff refused to provide him with a plastic cover for showering. The cast got wet on several occasions and "started to itch, stink and irritate," so Plaintiff tore the cast off. Subsequent check-ups and x-rays showed the arm had healed "with no ill-effects from prematurely [sic] removal of cast." The arm was re-cast, but the "prison had refused to take Plaintiff back to Dr. Bleday after arm had fully healed, so Plaintiff removed cast for final time."

Plaintiff filed this civil rights action on September 7, 2010. Originally named as Defendants to this action were: Michael Barone[1], Superintendent; Nurse Bunting; Dr. Maxa; Lt. Setnik, Captain Riskus, Dr. Bleday[2], and Nurse Sherbine. Defendants Barone, Bunting, Setnik

---

[1] Warden Barone has previously been dismissed from this case.

[2] The docket reflects that Defendant Dr. Bleday, the orthopedic surgeon who ultimately performed surgery on Plaintiff's arm at Kane Community Hospital, has not been served with the Complaint. See ECF No. 10.

and Riskus are employees of the Department of Corrections, are represented by the Attorney General, and will be referred to hereinafter as the "Department of Corrections Defendants." Defendants Maxa and Sherbine are represented by private counsel and will be referred to as the "Medical Defendants."

This Court has liberally construed these factual allegations as raising four distinct claims under the Eighth Amendment[3]:

> Claim One - the initial delay in medical treatment and pain medications following the altercation on October 11, 2008;
>
> Claim Two - the refusal to allow Plaintiff to use the ice pack and his placement into RHU around October 12th;
>
> Claim Three – the failure to provide Plaintiff with waterproof protection for his cast; and
>
> Claim Four - the denial of follow-up medical care after his surgery.

ECF No. 45. This Court does not read a medical malpractice claim in either the Original or Amended Complaints. Although Plaintiff has not specifically alleged as much, this Court liberally construes Claims One and Four as against Defendants Maxa, Sherbine, and Bunting, while Claims Two and Three are against Riskus and Setnik.

Following the filing of an Amended Complaint, both sets of represented Defendants filed renewed motions to dismiss. This Court issued a Report and Recommendation on those motions (ECF No. 45) and District Judge McLaughlin adopted the Report and Recommendation as the opinion of the Court by Order dated December 7, 2011 (ECF No. 47).

---

[3] In his complaint, Plaintiff claims that Defendants violated his constitutional rights under both the Eighth and Fourteenth Amendments. Where a due process claim is identical to an Eighth Amendment claim, the plaintiff must "bring the claim pursuant to the more explicit constitutional amendment." Ordonez v. Yost, 289 Fed.Appx 553, 555 (3d Cir. 2008) citing Graham v. Connor, 490 U.S. 386, 395 (1989). Accordingly, this Court need not conduct a separate due process analysis as to the identical factual allegations.

Thereafter, this Court issued a Case Management Order on December 14, 2011, scheduling deadlines for discovery and directing Plaintiff to file his pretrial narrative statement before April 2, 2012.  See ECF No. 49.  Plaintiff failed to file his pretrial statement and this Court issued a Show Cause Order, on April 10, 2012, indicating that Plaintiff must show cause for his failure before April 20, 2012, or risk dismissal of this case for failure to prosecute.  See ECF No. 57.  Plaintiff failed to comply with the Show Cause Order.

By Report and Recommendation filed on April 30, 2012, this Court recommended the dismissal of this case due to Plaintiff's failure to prosecute.  ECF No. 63.  Thereafter, Plaintiff sought an extension of time in which to file his overdue pretrial narrative statement (ECF Nos. 64, 66), which was granted until May 25, 2012 (see Text Order dated May 10, 2012).  Plaintiff again failed to comply with the Order directing the filing of the pretrial narrative statement.

On July 11, 2012, District Judge McLaughlin held a telephonic hearing and issued an Order rejecting the pending Report and Recommendation "for reasons set forth on the record." See Minute Entry dated July 11, 2012.  To date, Plaintiff has still not filed his Pretrial Narrative Statement, which was originally due by April 2, 2012.

Presently pending before this Court are the motions for summary judgment filed by the Department of Corrections Defendants and the Medical Defendants.  Plaintiff has filed an Opposition Brief.  These issues are fully briefed and are ripe for disposition by this Court.

### B.  Standards of Review

#### 1)  *Pro Se* Litigants

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520-521 (1972).  If

the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Dep't of Corrections, 949 F.2d 360 (10th Cir. 1991).  Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997).  See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court may consider facts and make inferences where it is appropriate.

### 2) Motion for summary judgment pursuant to Rule 56

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

Under Rule 56, a party opposing a motion for summary judgment must cite to specific materials in the record that demonstrate the existence of a disputed issue of material fact. See Fed.R.Civ.P. 56(c)(1)(A).  A material fact is a fact that "might affect the outcome of the suit

under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. at 249. "If the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) quoting Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998).

The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).[4]

_____

[4] When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson, 477 U.S. at 255. The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007). However, a court need not "turn a blind eye to the weight of the evidence." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### C. The Prison Litigation Reform Act

#### 1) The Exhaustion Requirement

Both sets of Defendants argue that summary judgment should be granted in their favor due to Plaintiff's failure to comply with the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), which provides that:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until such administrative remedies as are available are exhausted.

Id.

The requirement that an inmate exhaust administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes. Porter v. Nussle, 534 U.S. 516 (2002); Cutter v. Wilkinson, 544 U.S. 709, 723 n.12 (2005) (noting that the PLRA requires that "a prisoner may not sue under RLUIPA without first exhausting all available administrative remedies."); Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement). Administrative exhaustion must be completed prior to the filing of an action. McCarthy v. Madigan, 503 U.S. 140, 144 (1992). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies. Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997).[5] The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow. Nyhuis v.

---

[5] Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction. Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that §1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").[6]

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system. Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ..."). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." Id. at 83; see also Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) ("Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

## 2.    The Administrative Process Available to State Inmates

So then, no analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and

---

[6] There is no "futility" exception to the administrative exhaustion requirement. Banks v. Roberts, 2007 WL 3096585, at * 1 (3d Cir.) citing Nyhuis, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that 'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'"). See also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. at 218. See also Spruill, 372 F.3d at 231 (having concluded that the PLRA includes a procedural default component, the Court then indicated that "prison grievance procedures supply the yardstick for measuring procedural default.").

The DC-ADM 804 grievance system, available to state prisoners, consists of three separate stages. First, the prisoner is required to timely submit a written grievance for review by the facility manager or the regional grievance coordinator within fifteen days of the incident, who responds in writing within ten business days. Second, the inmate must timely submit a written appeal to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, the inmate must submit a timely appeal to the Central Office Review Committee within fifteen working days, and the inmate will receive a final determination in writing within thirty days. See Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 1997), aff'd. 532 U.S. 731 (2001).

### 3. Analysis of Exhaustion

#### a) Previous Report and Recommendation

Both sets of Defendants move for summary judgment on the basis of Plaintiff's alleged failure to exhaust in accordance with the PLRA. In Opposition, Plaintiff simply cites to this Court's previous Report and Recommendation in which it was recommended that the motions to dismiss on that basis be denied.

Plaintiff misinterprets this Court's previous ruling. The Report and Recommendation, as adopted as the Opinion of the Court, determined that Plaintiff exhausted his legal claim with respect to the denial of post-surgical follow-up care (at Claim Four) based upon the copies of

Grievance Number 262408[7] attached to Plaintiff's Original Complaint. It was also determined that Defendants failed to meet **their** burden to show that Plaintiff had not exhausted as to the remainder of his legal claims:[8] "the exhaustion defense may be revisited upon a more fully developed factual record at some later time." ECF No. 45, page 10. Presently before this Court is that "more fully developed factual record," along with a motion for summary judgment.

### b) The Developed Factual Record

In support of the presently pending motions for summary judgment, Defendants have provided evidence in support of their position that Plaintiff has failed to exhaust his administrative remedies. Plaintiff has offered no contrary evidence, as he must in order to defeat a fully supported motion for summary judgment. See Fed.R.Civ.P. 56(c)(1)(A).

Defendants point to the Declaration of Dorina Varner, the Chief Grievance Officer in the Secretary's Office of Inmate Grievances and Appeal for the Department of Corrections. See

---

[7] Upon further review of and reflection on Grievance Number 262408, I believe Plaintiff has indirectly referenced the initial 18-day delay in medical treatment, so as to have technically presented the factual grounds underlying Claim One through the administrative remedy process.

[8] In the previously issued Report and Recommendation on that subject, I reasoned:

> **Here, the failure to exhaust cannot provide a basis for the dismissal of this case at this initial stage of the proceedings as Defendants have not met their burden to show that Plaintiff has not exhausted**. Plaintiff has provided evidence that he has exhausted at least one of the four Eighth Amendment claims alleged and it is not Plaintiff's burden to prove that he has exhausted any of his claims at this point in the litigation. Ray.
>
> **It is impossible to determine whether Plaintiff has exhausted all the claims of this lawsuit,** but the complaint itself indicates that Plaintiff did fully exhaust some grievance regarding his medical treatment. Construing all the allegations in favor of the pro se non-movant, this Court must recommend the denial of the motion to dismiss for failure to exhaust at this time.

ECF No. 45, page 9 (emphasis added). See

ECF No. 70-1, Declaration of Dorina Varner.  Miss Varner explains that Plaintiff has filed two grievances with respect to the claims raised in this legal action, and that only one of those two grievances has been fully and properly presented through the final level of review in the administrative remedy process.  ECF No. 70-1, page 4.

### *Grievance Number 260862*

In Grievance 260862 (filed on February 6, 2009), Plaintiff stated:

> I grieve that I've received sub-standard medical treatment ever since my arm was fractured by another inmate.  My arm was broken on Oct. 11th, however, I had to suffer for 18 days before being taken out for surgery.  Since then, I've put in sick-calls to get an x-ray -- which I did get -- but no one will tell me the results of said x-ray.  My arm still hurts really bad and I need to know if it ever fully healed.  I've put in sick call several times.  But never was told the x-ray results.  Did not have access to grievances immediately after reporting the injury or for a few weeks after I had surgery.

ECF No. 70-1, page 14.

Due to an apparent procedural snafu (see ECF No. 70-1, pages 13-17; ECF No. 68, pages 7-8), Plaintiff did not exhaust Grievance Number 260862 to final review.  However, even if Plaintiff had presented this grievance through all three levels of review, it is of no moment in this lawsuit.   The subject matter of this Grievance focuses on the x-ray results (which is not the subject matter of any of Plaintiff's Claims) and the initial delay in medical treatment (which is also referenced in Grievance Number 262408 and was presented through all three levels of review).

### *Grievance Number 262408*

In Grievance Number 262408 (dated February 18, 2009), Plaintiff stated:

I'm grieving that I'm not being given adequate access to the orthopedic surgeon who operated on my arm. To this day it still pops when I twist my arm. I never did see the Dr. fur [sic] follow-up once the healing period ended. Not to mention I was forced to wait 18 days before I was taken to the hospital for surgery. Needless to say, the grievance filed in that case mysteriously disappeared. I've been complaining during sick-call visits.

ECF No. 70-1, page 6.

In the Response, Grievance Officer Donald Skunda denied the grievance and indicated that after a telephone conversation between the orthopedic surgeon and the Medical Director at SCI Forest, it was determined that transport to the doctor's outside facility was not necessary. Furthermore, "Inmate progress has been monitored by the **Medical Director, Physician's Assistant and the Nurse Practitioner** for proper healing." Id. at page 7.

In his Appeal to the Superintendent, Plaintiff indicated:

First, being the Department of Corrections spent a lot of money to have my arm put back together, it only makes good sense to let the orthopedic surgeon look at me one last time, just to be sure all went as planned, and there's no ill side-effects or post-surgery problems – which I do have. For one, when I twist my arm through its normal range of movement, a lot of times I can feel something snapping back and forth. I know this is definitely [sic] not normal, nor should this be happening. Plus whenever I get down to do push-ups – being I'm trying to lose weight (I'm fat) – the very back of my hand and wrist aches to the point I can't do more than 5 or so push-ups. Since I never had this problem prior to my arm being broken[9], I must attribute this condition to my arm being broken, and/or to the surgery and plate and 11 screws. I don't want **a nurse or physician** telling me what they "think" is causing these problems. We're talking about my arm, for God's sake. I have a right to be examined and be given a diagnosis by a specialist. Also, you and/or your staff made me wait 18 days before getting me medical attention. Unacceptable.

Id. at page 8.

In Response to the Appeal, Superintendent Barone denied the appeal and indicated that the orthopedic surgeon had conferred with the **SCI Forest Medical Director** and decided that

---

[9] It is worth noting that the medical records indicate that Plaintiff actually had a history of fracture in the left arm with plate and screw placement in 1999. See ECF No. 70-1, page 30; ECF No. 61-1, page 1.

any follow-up would be done at the institution.  In the follow-up at SCI Forest, the injury had demonstrated "proper healing."  Id. at page 9.

In his appeal to the final level of review, Plaintiff wrote:

> I wish to use all the same basis and facts that I sent to the Superintendent for this appeal as well – which is enclosed.  I have problems with my arm which the **physician's assistant and nurse practitioner** obviously do not specialize in and, therefore, cannot give me sound advice or treatment for.

Id. at page 10.

In Response to the final appeal, Chief Grievance Officer Dorina Varner indicated:

> The issue regarding seeing the orthopedic surgeon was referred to the Bureau of Health Care Services for their review.  The Bureau found that the medical care given by the medical department at SCI Forest has been reasonable and appropriate.  The record reflects that **Dr. Maxa** spoke with the orthopedic surgeon regarding the need for further evaluation by the specialist and it was determined that follow-up care could be provided by the medical department at SCI Forest.  The Bureau found no evidence of neglect or deliberate indifference by the medical staff at SCI Forest.

Id. at page 12.

Grievance Number 262408 was fully exhausted through the final level of review as Plaintiff presented it at all three levels of the administrative remedy process.  ECF No. 70-1, pages 6-12.  So as to Claim Four (denial of post-surgical follow-up care), Plaintiff has technically met the exhaustion requirements of the PLRA.  Additionally, because Plaintiff has referenced the initial 18-day delay in medical treatment, I find that he has presented the factual grounds underlying Claim One through the administrative remedy process.

Next, this Court must evaluate whether Plaintiff has properly exhausted his Claims One and Four as to the named Defendants (Dr. Maxa, PA Sherbine, and Nurse Bunting).  In Jones v. Bock, the Supreme Court established that "exhaustion is not per se inadequate simply because an individual later sued was not named in the prison grievances.  549 U.S. at 199.  The Court

rationalized that the primary purpose of the PLRA's exhaustion requirement is to allow "a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Id.

In any grievance within the Pennsylvania Department of Corrections, DC-ADM 804 requires that an inmate include a statement of fact relevant to the claim and

> [t]he inmate should identify any persons who may have information that could be helpful in resolving the grievance. The inmate should also include information on attempts to resolve the matter informally. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law. The inmate may include a reasonable request for compensation or other legal relief normally available from a court.[10]

DC-ADM 804, Section VI Procedures, A(1)(g).

In Spruill, the Third Circuit interpreted the language of this section of the DC-ADM 804:

> "[t]he verbs in this paragraph establish three tiers of grievance components: items that are mandatory ('shall'); items that are required to the extent practicable ('should'); and items that are optional ('may')."

Spruill, 372 F.3d at 233. See also Robinson v. Johnson, 343 Fed.Appx 778 (3d Cir. 2009).

Spruill and Robinson further reasoned that if the identities of Defendants were "facts relevant to the claim" it was mandatory for Plaintiff to name them in his grievance; if Defendants were "persons who may have information" or with whom Plaintiff made "attempts to resolve the matter informally" then Plaintiff was required to identify them, if practicable; and if Defendants did not fall into any of these categories, then Plaintiff was not required to identify them at all. See Spruill, 372 F.3d at 234; Robinson, 343 Fed. Appx at 781.

The names of Defendants Dr. Maxa, PA Sherbine and Nurse Bunting were relevant to Plaintiff's grievance. These Defendants, as medical personnel, surely had information that could

---

[10]   A newer version of DC-ADM 804 has been in effect since December of 2010.

have been helpful in resolving Plaintiff's grievance and certainly it was "practicable" for Plaintiff

to identify them as the relevant decision makers in regard to Plaintiff's healthcare. Plaintiff's

references (along with the references in the Department of Corrections' Responses) to the doctor,

physician's assistant, and nurse are sufficient to allow the prison to address complaints about the

program it administers. See Jones v. Bock, 549 U.S. at 199.


### 4. Summary of Exhaustion

The evidence before this Court demonstrates that Plaintiff has not exhausted his

administrative remedies in accordance with the PLRA on Claims Two and Three as there is

nothing in any Grievance that references the factual bases of these Claims (the ice packs, the

RHU placement, or the lack of waterproof protection for showering). Defendants Riskus and

Setnik[11] should be entitled to the award of summary judgment as to these Claims. On the other

hand, since Plaintiff has exhausted Claims One and Four against Defendants Maxa, Sherbine,

and Bunting, these claims will be addressed on the merits.


### D. Deliberate indifference

Defendants Maxa, Sherbine and Bunting move for summary judgment on Plaintiff's

deliberate indifference claims (i.e., Claim One - the initial delay in medical treatment and pain

---

[11] In the Amended Complaint, Plaintiff identifies Defendant Riskus as "the security captain at SCI Forest at the time," and Defendant Setnik as "the security Lt. at SCI Forest at the time" who "investigated the incident and subsequently issue[d] the write-up for the fight." ECF No. 33, page 5. Plaintiff alleges that security officers were responsible for taking the ice pack away from him (see id. at page 4) and for the failure to provide any shower protection for the case (id. at page 5). See also ECF No. 75, Plaintiff's Opposition Brief, pages 6-7 (indicating that Setnik and Riskus were deliberately indifferent by "not allowing the Plaintiff to retain the bag containing the ice while Plaintiff was in the observation cell.").

medications following the altercation on October 11, 2008, and Claim Four - the denial of follow-up medical care after his surgery).

In the medical context, a constitutional violation under the Eighth Amendment occurs only when prison officials are deliberately indifferent to serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). The standard is two-pronged, "[i]t requires deliberate indifference on the part of prison officials and it requires that the prisoner's medical needs be serious." West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Corr'al. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). A serious medical need may also arise "... when a delay in or denial of requested medical treatment causes an inmate to suffer a lifelong handicap or permanent loss." Peterson v. Achebe, 2007 WL 1381753, at * 3 (D.N.J. 2007) citing Lanzaro, 834 F.2d at 347.

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S at 104. Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer, 991 F.2d at 68, or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Deliberate indifference is generally not found when some level of medical care has been offered to the inmate. Clark v. Doe, 2000 WL 1522855, at *2 (E.D.Pa. 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). There is necessarily a distinction between a case in which the prisoner claims a

complete denial of medical treatment and one where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment. United States ex rel. Walker v. Fayette County, 599 F.2d 533, 575 n.2 (3d Cir. 1979). Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979) quoting Bowring v. Goodwin, 551 F.2d 44, 48 (4th Cir.1977).

### Claim One – Delay in Treatment and Care

I previously held that the crux of Plaintiff's allegations at Claim One centered around the delay in medical treatment. See Durmer, 991 F.2d 64 (deliberate indifference can be manifested by an intentional refusal to provide care, delayed medical treatment, and the denial of prescribed medical treatment). Plaintiff's factual allegations in the pleadings were sufficient to state a plausible claim for relief under the Eighth Amendment, and so, defeated the motions to dismiss. However, in support of their motions for summary judgment, Defendants have provided this Court with pages and pages of Plaintiff's medical records which reveal that there was no delay in medical treatment or care following the injury on October 11, 2008.

The evidence before this Court demonstrates that Plaintiff was involved in the altercation at 11:00 pm on the night of October 11, 2008, and he reported to the dispensary the following morning at 7:08 am, where he was examined by Nurse Bunting. ECF No. 70-1, page 27. At the first morning exam, Plaintiff was given 1000mg of Tylenol. ECF No. 61-2, page 4. Later that morning, Plaintiff was examined by P.A. Sherbine. Later that same day, Plaintiff was examined by Dr. Maxa who ordered an x-ray of the arm. Defendant Maxa issued a "medical lay"[12] of

---

[12] Medical lay indicates that the inmate may not participate in work, activities or yard.

seven days; a sling for seven days; ice for 24 hours; and medications for pain and discomfort for seven days. ECF No. 61-3, page 49 (Ibuprofen); ECF No. 61-2, page 4 (Tylenol).

On October 14th, the ordered x-ray of the arm was taken and revealed an "acute fracture with mild displacement involving the mid shaft of the left ulna, which is located just proximal to a distal fixation plate." ECF No. 61-4, page 1. Dr. Maxa ordered a consultation with Dr. Bleday, an outside orthopedic specialist, which was scheduled for October 20th. ECF No. 61-2, pages 1-2. Also on October 14th, PA Sherbine examined Harsh and applied a plaster gutter splint. Id.

On October 16th, nursing staff noted that Plaintiff was complaining of numbness in his left thumb, but he was able to move his fingers. Nursing staff advised Plaintiff to elevate his arm to help with swelling. ECF No. 61-2, page 2.

The following morning, nursing staff noted that Plaintiff continued to complain of numbness and reinforced the need for Plaintiff to elevate his arm noting his refusal to comply with this instruction. Later that same day, nursing staff noted that Plaintiff refused an assessment of his left hand and became verbally abusive.[13] Id.

On October 18th, nursing staff noted that Plaintiff was able to move his fingers. ECF No. 61-2, page 5. Later that day, Plaintiff was observed lying in bed not elevating his arm. Id.

On October 20th, Plaintiff was examined by Dr. Bleday, the outside orthopedic specialist, who directed Plaintiff to wear a splint and requested that surgery be ordered. ECF No. 61-5, page 1; ECF No. 61-2, pages 5-6. The same day, Dr. Maxa ordered a further consultation for Plaintiff with Dr. Bleday and the outside consultation/surgery was scheduled for October 30th.

_____

[13] Plaintiff's medical records are filled with references to Plaintiff's non-compliance with medical instructions.

Id. On October 22nd, Plaintiff had lab work drawn in preparation for surgery. ECF No. 61-7, pages 1-3.

At an examination on October 25th, nursing staff noted that Plaintiff's left hand was swollen and advised Plaintiff to keep his hand and arm elevated. ECF No. 61-2, page 6.

On October 27th, Plaintiff was examined by PA Sherbine who noted the scheduling of the upcoming surgery. Sherbine also noted that Plaintiff was non-compliant with wearing the splint. Id. Tylenol was ordered for 30 days. ECF No. 61-3, page 48.

On October 30th, Plaintiff was transported to Dr. Bleday who performed the surgery[14] on Plaintiff's arm. ECF No. 61-2, page 7; ECF No. 61-6, page 1. Plaintiff's Tylenol was discontinued at this time. ECF No. 61-3, page 47. Upon Plaintiff's return to the institution, Dr. Maxa ordered Vicodin for seven days. ECF No. 61-3, page 48.

In Opposition, Plaintiff has not provided any evidence contradicting the prompt medical treatment provided by prison staff and accordingly, summary judgment should be granted in favor of Defendants Maxa, Sherbine and Bunting as to Claim One. See Fed.R.Civ.P. 56(c)(1)(A).

### Claim Four – Denial of Follow-up Care with Orthopedic Specialist

As to Claim Four, the record reflects that Plaintiff received follow-up treatment after his surgery.

Following the October 30th surgery, Dr. Bleday ordered rest, ice, and elevation of the forearm. Dr. Bleday also indicated removal of the Ace bandage around the univalve cast if Plaintiff complained of it being too tight. ECF No. 61-6, page 1; ECF No. 61-3, page 48.

---

[14] The surgery performed was ORIF, an open reduction internal fixation whereby metal hardware is inserted directly into the bone fragments during surgery. See ECF No. 60, ¶ 22, n2.

Furthermore, Dr. Bleday ordered that Plaintiff keep his cast dry and directed that he not remove it. ECF No. 61-6, page 1. Following his return to the SCI, Plaintiff was placed in the infirmary, and Dr. Maxa ordered a consultation for Plaintiff's follow-up care with Dr. Bleday.

On the evening of October 31st, Plaintiff was transferred to the RHU. ECF No. 61-2, pages 7-9. On November 7, 2008, nursing staff noted that Plaintiff had removed his splint on his own, but that all 24 surgical staples were intact. Id. at page 10. Dr. Maxa was notified and charted that Plaintiff reported to nursing staff that his cast had gotten wet in the shower. Id. The cast was damp and the inner lining was in disarray. Id. PA Sherbine examined Plaintiff and reapplied the cast. Id.

Nursing staff followed-up on Plaintiff checking his cast from November 8th through 18th. Id. at pages 11-13. On November 11th, Plaintiff was uncooperative with nursing staff. Id. at page 11.

Dr. Bleday examined Plaintiff on November 12th and requested x-rays at the next visit and to follow-up in two to three weeks. ECF No. 61-8, page 1; ECF No. 61-2, page 13. Consistent with Bleday's request, Dr. Maxa ordered the x-ray, which was taken on December 4th, and revealed the orthopedic hardware pinning the fractured ulna "in near-anatomic alignment." ECF No. 61-9, page 1.

Nursing staff checked on Plaintiff on a daily basis from November 19th through December 14th, noting the Plaintiff refused to remove his arm from his sleeve on December 2nd, and on December 8th, Plaintiff refused sick call for his medications. ECF No. 61-2, pages 15-19. Late on December 14th, nursing staff noted that Plaintiff had removed his cast on his own and that Plaintiff was to report to the PA the following morning. Id. at pages 18-19.

On December 15th, Dr. Maxa noted that he had spoken to Dr. Bleday as Plaintiff had removed his cast again. Dr. Bleday indicated there was no need to follow-up but requested that an x-ray of the arm be taken in one month to assure alignment. Id. at page 19. The full note reads:

> Spoke with Dr. Bleday's office re: inmate removing cast again. Informed that there is no need to follow-up with him. […] [Needs] re-x-ray again in one month to assure alignment since inmate is noncompliant with cast, etc. Will have PA follow-up with him in one month to get x-ray.

Id. at page 20.

On January 13, 2009, Sherbine saw Plaintiff who requested another x-ray and complained of an ache in his arm. Sherbine noted a well-healed incision and ordered an x-ray. ECF No. 61-2, page 23; ECF No. 61-3, page 45. Tylenol and Motrin were ordered. ECF No. 61-3, page 45.

An x-ray was conducted on January 15th and indicated that the orthopedic hardware was in place. ECF No. 61-10, page 1.

On January 21st, Plaintiff requested his x-ray results, but the final report was unavailable. ECF No. 61-2, page 23. At a sick call appointment on February 13th for an unrelated ailment, Sherbine discussed the results of the most recent x-ray. Id. at page 24.

On March 17th, while housed in the RHU, Plaintiff refused a sick call visit for complaints of left arm pain. ECF No. 61-2, page 26; ECF No. 61-11, Release from Responsibility for Medical Treatment, page 1.

On July 22, 2009, x-rays were taken and revealed "mild soft tissue swelling" but "otherwise satisfactory post-surgical appearance of healed internally fixed fracture of the mid shaft of the left ulna in anatomic alignment" with "fixation plate with multiple screws intact." ECF No. 61-12, page 1.

The medical records demonstrate that Plaintiff received follow-up medical care after his surgery, in spite of his own non-compliance with medical instructions and his own argumentative attitude toward nursing staff. Again, Plaintiff has provided no evidence to the contrary. See Fed.R.Civ.P. 56(c)(1)(A). Plaintiff's grievances demonstrate that he was unhappy with the follow-up care offered by general medical staff at the prison, and instead preferred more extensive follow-up care with Dr. Bleday, the orthopedic specialist. See supra. However, Plaintiff is not constitutionally entitled to have personal follow-up visits with the outside orthopedic specialist.

Summary judgment should be granted in favor of Defendants Maxa, Sherbine and Bunting as to Claim Four.


## III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the motion for summary judgment filed by Defendants Maxa and Sherbine [ECF No. 58] be GRANTED.

The motion for summary judgment filed by Defendants Bunting, Riskus, and Setnik [ECF No. 67] should be GRANTED.

In accordance with 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72, the parties must seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of Objections to respond thereto. See Fed.R.Civ.P. 72(b)(2). Failure to file timely objections may constitute a waiver of appellate rights. See Brightwell v. Lehman, 637 F.3d 187, 194 n.7 (3d Cir. 2011); Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: February 12, 2013